[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 418.]

THE STATE OF OHIO, APPELLEE, *v.* BASTON, APPELLANT.

[Cite as *State v. Baston*, 1999-Ohio-280.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 97-2204—Submitted January 27, 1999—Decided May 12, 1999.)

APPEAL from the Court of Appeals for Lucas County, No. L-95-087.

———————————

{¶ 1} Johnny Baston, appellant, was charged with aggravated robbery and the capital aggravated murder of Chong Mah. Baston waived his right to be tried by a jury, and the case proceeded before a three-judge panel. The panel found Baston guilty of all charges and, after a penalty hearing, sentenced him to death. The court of appeals affirmed.

{¶ 2} Chong Mah and his wife, Jin-Ju Mah, owned two retail stores in Toledo. Chong Mah managed the couple's downtown store, Continental Wigs N' Things. In addition to wigs, the store sold team logo hats and jackets. At approximately 11:30 a.m. on March 21, 1994, Jin-Ju Mah telephoned her husband and spoke to him at the downtown store. When Chong Mah failed to answer a later call, Jin-Ju Mah became concerned. She then went to the downtown store, arriving around 5:10-5:15 p.m. She found the store unlocked and the lights on. The cash register was open and empty. In a rear storage room, Jin-Ju Mah found her husband's body—he had been shot once through the head. Chong Mah was pronounced dead at the scene.

{¶ 3} Investigators found a single .45 caliber hollow-point slug behind the wall paneling in the room where Chong Mah was shot. An autopsy revealed that Chong Mah had been shot in the back of the head at a range of two to three inches. Examination of the crime scene caused investigators to believe that, in addition to

the money in the cash register, Chong Mah's killer had also taken team logo hats and "Starter" type jackets from the store.

{¶ 4} Also on March 21, 1994, David Smith went to downtown Toledo to meet with his parole officer. Baston accompanied him, but was not permitted to stay for the appointment. Records indicated that Smith met with his parole officer at approximately 11:30 a.m., and that the meeting lasted ten to fifteen minutes. When Smith left the meeting, he tried to find Baston. He "beeped" Baston on his pager, but there was no response. Smith then walked back and forth between the municipal building and the county jail four times, finally finding Baston in the vicinity of the municipal court. Baston and another friend, Bobby Mitchell, were in a yellow Cadillac owned by Smith's cousin, Michael Ridley.

{¶ 5} Mitchell first saw Baston on March 21, 1994 on River Street. Baston was carrying a dark brown plastic garbage bag that appeared to have something in it. Mitchell passed Baston as Mitchell went to his car, before proceeding to Smith's apartment, where he again saw Baston. Mitchell was there to see Ridley, who was also staying at the apartment.

{¶ 6} While Mitchell was at Smith's apartment, he noticed some sports hats lined up on an end table, as well as a revolver. A short time later, Mitchell and Baston left the apartment in Ridley's Cadillac to pick up Smith downtown. When the two picked up Smith in front of the municipal court building, Mitchell was driving, Baston was in the passenger's seat, and Smith got in the back seat. Mitchell overheard Smith and Baston "mumbling" to each other, and heard Baston tell Smith, "I did it." The trio then drove back to Smith's apartment.

{¶ 7} After news coverage of Chong Mah's murder, an employee of a nearby club/bar reported to police that at approximately 11:45 a.m. on the day of the murder, she saw a man carrying a plastic bag walk across a parking lot near the wig shop. The man caught her attention because he was heavily dressed despite it being unseasonably warm that day, and he was wearing a team logo jacket, and

another jacket draped over his shoulders. She later said the man could have been Baston, but was unable to positively identify him. A patron of the bookstore adjacent to or near the wig shop told police that he thought he heard a gunshot shortly before noon on March 21, 1994.

{¶ 8} A few days after the murder, Patricia Chininis contacted the Toledo Police. Patricia Chininis's daughter, Deana, was Smith's girlfriend. Both women also knew Baston. Patricia Chininis related that on the day before the shooting, Baston and Smith were at her house. In moving Baston's jacket, Patricia Chininis noticed it was unusually heavy. She felt the jacket, realized there was a gun in it, and told Baston and Smith never to come back to her house with a gun. Deana Chininis stated she previously saw both Smith and Baston with revolver-type guns and hollow-point bullets. Furthermore, the day or so after the murder Baston offered to give Deana's girlfriend a Starter jacket.

{¶ 9} After receiving this information, police obtained a search warrant for Smith's apartment (where Baston was staying). Police seized four sport logo hats and several Starter jackets. A wig store employee identified these articles as being similar to those the store carried. The employee, an African-American, also recalled that three weeks prior to the killing three African-American males were in the store acting suspiciously. The employee overheard one of the three say to another: "No, it's a sister in here," before they left. The employee identified Baston as one of the three.

{¶ 10} Smith, Deana Chininis, and two other persons were at the apartment when police executed the search warrant. While all four went to the police station, only Smith was cooperative. After interviewing Smith, the police obtained an arrest warrant for Baston.

{¶ 11} Baston was arrested in Columbus, Ohio, at a church function. He was carrying a .25 caliber semi-automatic pistol and had a .45 caliber semi-automatic revolver in his luggage. The .45 caliber slug recovered at the crime scene

matched those test-fired from the .45 caliber revolver seized from Baston. In an interview with Columbus police shortly after his arrest, Baston admitted participating in the robbery of the wig shop, but denied shooting Chong Mah. According to Baston, an accomplice named "Ray" took Chong Mah into the back room and shot him. Baston denied any intention to kill anyone, and claimed that Ray acted without Baston's prior knowledge.

{¶ 12} Baston was indicted on two counts of aggravated murder and one count of aggravated robbery with a firearm specification. Each aggravated murder count carried a capital specification pursuant to R.C. 2929.04(A)(7). Baston pleaded not guilty and elected to be tried before a three-judge panel.

{¶ 13} Baston contested that he was the principal offender in the aggravated murder. William Nappins, a defense witness, testified that while on his way to an Alcoholics Anonymous meeting at approximately 11:45 a.m. on the morning of the murder, he saw a tall, dark-skinned African-American male emerge from either the wig store or the book store next to it. The man was dressed in black and carrying a bag. Nappins's description of the man did not match that of Baston.

{¶ 14} The defense argued that David Smith was the Ray that Baston had named as the actual triggerman during his Columbus interrogation. The defense asserted that the presence of another gunman at the wig shop robbery created a reasonable doubt as to the capital specifications. The panel nevertheless found appellant guilty on all counts and specifications.

{¶ 15} The panel sentenced Baston to death on one of the aggravated murder counts, and to terms of imprisonment for both the aggravated robbery and the gun specification. Although it sustained three of Baston's assignments of error, the court of appeals affirmed Baston's convictions after curing the errors with its independent review. The state did not file a cross-appeal. The cause is now before this court upon an appeal as of right.

———————————

*Julia R. Bates*, Lucas County Prosecuting Attorney, and *Craig T. Pearson*, Assistant Prosecuting Attorney, for appellee.

*Jeffrey M. Gamso* and *Spiros P. Cocoves*, for appellant.

_____

**COOK, J.**

{¶ 16} In this appeal, Baston has raised eight propositions of law. Finding none meritorious, we affirm his convictions. In addition, we have independently reviewed the record, weighed the aggravating circumstance against the mitigating factors, and examined the proportionality of the death sentence in this case in comparison to the penalty imposed in similar cases. Upon a complete review of the record, we affirm Baston's convictions and sentences.

### Jury Waiver

{¶ 17} In his first proposition of law, Baston argues that a jury waiver in a capital case is not made knowingly, intelligently, and voluntarily unless the defendant is aware of all the implications of the waiver. Baston cites this court's decision in *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759, which reaffirmed that "this court indulges ' * * * in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *Id*., quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 136, 239 N.E.2d 65, 70. Baston argues that, because of this presumption, the trial court was required to ensure that Baston understood that he was giving up the right to meaningful appellate review by choosing to have a three-judge panel decide the case.

{¶ 18} In *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus, we held that "[t]here is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." "The Criminal Rules and Revised Code are satisfied by a

written waiver, signed by the defendant, filed with the court, and made in open court * * *." *Id.* at 26, 559 N.E.2d at 468. It is undisputed that the written waiver required by the Criminal Rules and Revised Code was properly executed in this case.

{¶ 19} Additionally, the presiding judge engaged in an extensive colloquy with Baston. Baston argues that because that colloquy appeared thorough, but did not include reference to the appellate court presumption that the three-judge panel considered only relevant evidence, Baston was actually misinformed and consequently his plea was not intelligent, voluntary, and knowing. Baston cites in support *State v. Ruppert* (1978), 54 Ohio St.2d 263, 8 O.O.3d 232, 375 N.E.2d 1250 (jury waiver held inadequate because the appellant was told that the three-judge panel's verdict had to be unanimous when a majority verdict would suffice). We find this argument meritless. The panel did not misinform Baston and nothing in the panel's colloquy suggested that it was meant to be a thorough discussion of all the implications of a jury waiver, including the standard of appellate review that would be applied in this case.

{¶ 20} Baston additionally argues that the *Jells* analysis fails to address the question of whether a jury waiver, which may satisfy R.C. 2945.05, also satisfies the federal and Ohio Constitutions. There is no constitutional case law directly addressing what inquiries must be made when a defendant waives his right to trial by jury. The cases addressing waiver of fundamental constitutional rights emphasize that trial courts must apprise the defendant of the "relevant circumstances and likely consequences" to determine whether the defendant's waiver is made freely and intelligently. See, *e.g.*, *Brady v. United States* (1970), 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (right to trial); *Johnson v. Zerbst* (1938), 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1467.

**{¶ 21}** Here, the trial court, as a threshold matter, asked both defense counsel whether they had discussed with Baston "the differences in the capital context between a jury trial and a trial to a three-judge panel." Counsel related that they had discussed this with Baston, and that Baston "underst[ood] those differences and his rights in all aspects." Further, the trial court advised Baston that he had the right to have a jury trial; that this meant twelve persons would be chosen, with input from his counsel; that twelve persons would have to be unanimous in their verdict of guilt; that if the jury found him guilty, the jury would also determine the penalty and make a recommendation to the trial judge; that the waiver would result in a trial by three judges; that the three judges would have to be unanimous in their finding of sentence; and that if even one judge did not think that death was appropriate, it could not be imposed. Although the trial court did not specifically refer to the standard of review that would be applied on appeal, Baston cites no authority requiring such reference.

**{¶ 22}** This proposition of law is overruled.

### Trial Phase Witness Issues

**{¶ 23}** In Proposition of Law No. II, Baston argues that three evidentiary rulings by the trial court deprived him of his constitutional rights.

**{¶ 24}** <u>Coroner Testimony</u>: First, Baston argues that the trial court erred in allowing Dr. Diane Scala-Barnett, a deputy coroner in Lucas County, to provide expert testimony regarding (1) the distance from gunshot to wound; (2) blood spatter, pooling, droplet, and transfer patterns; and (3) cause of death. Baston argues that she was not qualified as an expert.

**{¶ 25}** Evid.R. 702(B) addresses the qualifications necessary to accord a witness "expert" status. Under the rule, a witness may qualify as an expert by reason of her knowledge, experience, skill, training, or education. Neither special education nor certification is necessary to confer expert status upon a witness. See *State v. Boston* (1989), 46 Ohio St.3d 108, 119, 545 N.E.2d 1220, 1231-1232. The

individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge she possesses will aid the trier-of-fact in performing its fact-finding function. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915. Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 148, 446 N.E.2d 444, 448.

{¶ 26} Since 1985, Dr. Scala-Barnett has been a forensic pathologist and a deputy coroner whose responsibilities include attending scene investigations and performing medical-legal autopsies to determine the cause and manner of death. The questioning concerning her education was somewhat sketchy, in that she stated she was licensed to practice in Ohio and Illinois, but failed to specify what she was licensed to practice. She did however indicate that she was board certified in both pathology and forensic pathology.

{¶ 27} While the state never formally tendered Dr. Scala-Barnett as an expert, during the course of questioning to qualify her as an expert, defense counsel never objected or challenged her qualifications to testify as to the distance between the gun's muzzle and the wound, and as to the cause of death. Thus, Baston waived all but plain error. Crim.R. 52(B); *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus, vacated on other grounds, 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156.

{¶ 28} The state's failure to qualify Dr. Scala-Barnett in more detail does not rise to the level of plain error. Her experience as a deputy coroner and her board certifications in pathology and forensic pathology qualify her to testify regarding the cause of death and the distance between the gun's muzzle and the victim's head at the time the gun was fired. Further, some of this testimony was the same as the testimony of Joshua Franks, a senior criminalist at the Forensics Laboratory, whose qualifications were stipulated to by defense counsel.

{¶ 29} Defense counsel did, however, object to Dr. Scala-Barnett's testimony as not being expert in blood spatter. The court sustained defense counsel's objection. When the witness returned to the subject of blood spatter, counsel did not object. Dr. Scala-Barnett then testified how the blood-spatter evidence led her and the police criminologist Detective Chad Culpert to discover the spent slug behind the paneling. This testimony was similar to that of Detective Culpert, whose qualifications were not questioned. See *State v. Biros* (1997), 78 Ohio St.3d 426, 452-453, 678 N.E.2d 891, 913 (The trial court did not abuse its discretion in allowing a forensic scientist to give expert testimony about blood-spatter evidence, as the witness had been involved in thousands of cases dealing with blood analysis and trace evidence; also, other evidence corroborated the testimony, so there was no plain error.). Furthermore, the testimony concerning blood spatter was helpful to an understanding of how the victim was shot and ended up in a supine position, but it was not crucial to any issue in dispute in this case. Assuming the admission of this evidence was error, it was harmless beyond a reasonable doubt. Crim.R. 52(A); *State v. Zimmerman* (1985), 18 Ohio St.3d 43, 45, 18 OBR 79, 81, 479 N.E.2d 862, 863. There was no prejudicial error in allowing Dr. Scala-Barnett to testify in this case.

{¶ 30} Witness Statement: Baston next argues that the panel abused its discretion when it permitted the prosecutor to question witness David Smith about the contents of a tape-recorded statement that the panel had just ruled inadmissible.

{¶ 31} In his taped statement Smith implicated Baston based on a prior conversation between them. The state called Smith as a witness in its case-in-chief. Smith related information about the events of the morning of the murder, but when it came to information concerning his conversation with Baston, he did not recall what he had told the police concerning the conversation. The prosecutor then questioned Smith about the content of the statement, and the defense objected. During a sidebar, the prosecutor indicated that he had doubts about Smith, and that

on the previous Friday, Smith had told the defense investigator that he was going to get on the stand and say he did not remember anything. The prosecutor asked to be able to play the witness's previous statements to the witness based on surprise under Evid.R. 607.

{¶ 32} The court sustained the defense objection based on Evid.R. 607, but indicated that it would allow the statement to be used under Evid.R. 803(5), as a recorded recollection. The tape was played for Smith, outside the presence of the panel. When the state resumed questioning, Smith testified that he did not recall making the statements recorded on the tape and did not recall whether they were true. Smith claimed he had blocked a lot of "stuff" out of his memory. The prosecutor questioned Smith on whether his recollection was refreshed after listening to the tape recording, and Smith said "No."

{¶ 33} After struggling through the questioning of Smith, the state sought to play the tape recording of the police interview, or to provide a transcript of the interview for the panel. Defense counsel objected, arguing that the state had not developed the proper foundation required to play the tape. The court sustained the objection, and the tape was not played, nor was a transcription provided to the panel.

{¶ 34} Once the court ruled that the tape could not be played, the state asked Smith a series of questions based on his statements to police. In each question Smith was asked whether he recalled making a certain statement to the police; and each time he indicated he did not recall. The prosecutor followed up by asking whether he heard the tape, followed the transcripts, and whether it was his voice on the tape. Smith indicated he heard the tape and followed along, but that it did not refresh his recollection.

{¶ 35} Baston now argues that the questioning by the prosecutor allowed the state to get in "through the back door" what it could not get in through the front door. Baston relies on *State v. Holmes* (1987), 30 Ohio St.3d 20, 22, 30 OBR 27,

29, 506 N.E.2d 204, 207, and the Staff Note to Evid.R. 607. Yet, the trial court here ruled the statement inadmissible under Evid.R. 607. The state was allowed to refresh recollection and use the statement as a recorded recollection pursuant to Evid.R. 803(5). The witness never adopted the statement, the tape was never played for the panel, and neither the tape nor the transcription of the taped statement was admitted into evidence.

{¶ 36} Since the trial court ruled that the statement could be used pursuant to Evid.R. 803(5), it was not error for the state to question Smith concerning the statement. Baston has not alleged that the trial court erred in allowing the use of the statement pursuant to Evid.R. 803(5).

{¶ 37} Further, the case was tried before a three-judge panel, and the usual presumption that the judges considered only relevant evidence applies. *State v. Post*, 32 Ohio St.3d at 384, 513 N.E.2d at 759.

{¶ 38} Questioning by Three-Judge Panel: At various times during trial, members of the three-judge panel questioned witnesses called to testify by the parties. Baston alleges error in the panel's questioning. He argues that the fact-finder, in this case the panel, should take facts as presented by the parties and should not take on the role of seeking facts.

{¶ 39} Baston cites four examples in the transcript; however, not once was an objection entered to the court's questioning; therefore, Baston waived all but plain error. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, at paragraph two of the syllabus; Evid.R. 614(C). An alleged error "does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Here there is no error, plain or otherwise.

{¶ 40} Evid.R. 614(B) provides that "[t]he court may interrogate witnesses in an impartial manner, whether called by itself or a party." Baston concedes that

this is the law, but asks this court to find the rule unconstitutional, since it interferes with the fundamental right to fair trial in the adversary system. While it is possible to cross the line from helpful clarification to unwarranted intervention, that did not happen here. See, generally, *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613, paragraphs three and four of the syllabus; *State v. Prokos* (1993), 91 Ohio App.3d 39, 44, 631 N.E.2d 684, 687.

{¶ 41} The questioning here was limited, and consisted mostly of attempts to clarify the witnesses' testimony, as is contemplated by the rule. See *State v. Lieberman* (1961), 114 Ohio App. 339, 347, 18 O.O.2d 25, 29, 179 N.E.2d 108, 113. The questioning was neither excessive nor prejudicial to the defendant. *Sandusky v. DeGidio* (1988), 51 Ohio App.3d 202, 204, 555 N.E.2d 680, 681-682. "In absence of any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in propounding to the witness questions from the bench] in attempting to ascertain a material fact or to develop the truth." *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 98, 7 OBR 124, 129, 454 N.E.2d 541, 548; see, also, *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph two of the syllabus, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157. The questioning by the panel was not error.

{¶ 42} Since none of Baston's arguments concerning trial phase evidentiary issues has merit, his second proposition of law is overruled.

### *Prosecutorial Misconduct*

{¶ 43} <u>Uncharged Capital Specification</u>: Baston was charged with alternative counts of aggravated murder under R.C. 2903.01. Attached to each count was a capital specification that the murder was committed while Baston was committing an aggravated robbery. During the state's closing argument in the penalty phase, the prosecutor argued:

"[A]nd what we have to look at are the aggravating factors that were committed in this case * * *. This was not—this was not any kind of an attempt to do anything but eliminate a witness."

{¶ 44} While committing an aggravated murder to escape detection is an aggravating circumstance under R.C. 2929.04(A)(3), that circumstance was not charged in Baston's case. Baston argues that the prosecutor effectively amended the indictment by arguing that the murder was committed to eliminate a witness. In *State v. Dilley* (1989), 47 Ohio St.3d 20, 546 N.E.2d 937, syllabus, we held that "[t]he state may not amend an indictment pursuant to Crim.R. 7(D) so as to include a specification contained in R.C. 2941.143 without first presenting the specification to the grand jury or following the other alternatives contained in R.C. 2941.143."

{¶ 45} The state counters that these comments by the prosecutor did not impermissibly amend the indictment because they were necessary to establish prior calculation and design for the first count of aggravated murder and the capital specification. The state's argument fails for two reasons. First, the prosecutor's remarks were made in the penalty phase, after the aggravated murder had already been established. Second, the state's theory supporting the capital specification was that Baston was the principal offender; therefore, the portion of the R.C. 2929.04(A)(7) specification requiring prior calculation and design was irrelevant. The "killing of a witness" was not a charged aggravating circumstance. The prosecutor should have focused on the statutory factor, which was charged and proven in the trial phase, and not on factors that were not charged. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph one of the syllabus.

{¶ 46} Because Baston's counsel did not object to the prosecutor's comments, we consider only whether these statement's rise to the level of plain error. *State v. White* (1998), 82 Ohio St.3d 16, 22, 693 N.E.2d 772, 778. We do not believe that the prosecutor's comments made a difference in the outcome of the

trial. The panel found Baston guilty of only the R.C. 2929.04(A)(7) specification. See *Wogenstahl*, 75 Ohio St.3d at 357, 662 N.E.2d at 322.

{¶ 47} Although the trial court panel mentioned the "elimination of a potential witness" in its R.C. 2929.03(F) opinion, the independent appellate reweighing of the aggravating circumstance Baston was found guilty of committing against the mitigating factors presented cures this defect. See *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304; *State v. Holloway* (1988), 38 Ohio St.3d 239, 242, 527 N.E.2d 831, 835.

{¶ 48} <u>Urging the Trial Court to Refuse to Consider a Mitigating Factor</u>**:** Baston relied upon the mitigating factor of residual doubt in the penalty phase of his case. During closing argument, the prosecutor remarked:

"I have attempted to figure out what residual doubt is. It still isn't very clear to me. And if the residual doubt can be defined in this case, then I suggest to the Court that they allow the Supreme Court to make the determination here as to whether residual doubt exists. I don't see it."

{¶ 49} The prosecutor's argument here questioning the validity of residual doubt as a mitigating factor was prescient in that this court later rejected residual doubt as a mitigating factor. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. But, we respond here only to the narrower argument of defendant that it would be misconduct for a prosecutor to urge a court simply to ignore residual doubt while that factor continued to be recognized in the decisional law.

{¶ 50} Baston argues that the prosecutor's remarks urged the panel to disregard its statutory duty to consider residual doubt. Baston's counsel did not object to the prosecutor's statement. And the comments had no effect on the outcome of the trial because contrary to the prosecutor's urging, the panel examined the factor of residual doubt.

{¶ 51} Since neither of Baston's prosecutorial misconduct arguments provides a basis for vacating the death sentence, we overrule this proposition of law.

### Appellate Court Reweighing

{¶ 52} In the court of appeals, Baston raised three assignments of error addressing errors in the trial panel's opinion filed pursuant to R.C. 2929.03(F): (1) erroneous consideration of victim-impact statements, (2) consideration of possible future criminal behavior, and (3) reliance on the nature and circumstances of the offense as an aggravating circumstance. The court of appeals sustained all three assignments of error. Yet, the court affirmed the sentence of death after independently weighing the correct aggravating circumstance against mitigating factors.

{¶ 53} The state did not cross-appeal the court of appeals' findings on the three assignments; therefore, the substance of those assignments of error is not before us. Baston now argues that the appellate reweighing could not cure the errors because the trial court's R.C. 2929.03(F) opinion demonstrates that the panel had a "clear and evident bias" against Baston. This bias, Baston asserts, denied him a fair trial by a neutral fact-finder. He claims that the trial court's opinion demonstrates structural error that could not be cured by independent reweighing by the appellate court. *State v. Esparza* (1996), 74 Ohio St.3d 660, 662, 660 N.E.2d 1194, 1196, quoting *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331 (" '[T]he presence on the bench of a judge who is not impartial, is structural constitutional error.' ").

{¶ 54} Baston cites excerpts from the opinion as demonstrative of the court's bias. The court wrote that the victim was "a man of uncommon accomplishment, courage, enterprise and decency * * * [and] a good husband, kind father, close brother, and warm friend." The panel stated that appellant's "adult [criminal] record was minor in nature, owing large part to the fact that he was barely

twenty years of age at the commission of this offense." And Baston cites the court's reference to him as a "gun-toting, false-macho, selfish and violent mess."

{¶ 55} When read in the context of the entire opinion, we do not find that the portions cited exhibit bias. The opinion, as a whole, belies that the panel "display[ed] a deep-seated favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States* (1994), 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474, 491. To the contrary, the panel expressly stated that it engaged in a "dispassionate review." We will not presume that the trial court acted with bias. To the contrary, even without an affirmative declaration, this court presumes the regularity of the proceedings. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 92, 656 N.E.2d 643, 663. Presumptions that the court acted without bias and prejudice are not necessary in this case because we have the assurances of the trial court panel. Accordingly we overrule this proposition of law.

### Constitutionality of Death Penalty

{¶ 56} Baston argues that Ohio's capital sentencing scheme results in cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and violates other federal and Ohio constitutional provisions. The same arguments, however, have been examined and disposed of in numerous cases. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 285-286, 509 N.E.2d 383, 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633-634; *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

***Proportionality Review***

**{¶ 57}** In his sixth proposition of law, Baston asks the court to revisit *State v. Steffen*, at the syllabus, concerning the universe of cases to be considered by an appellate court when conducting the proportionality review required by R.C. 2929.05(A). Baston presents no new arguments relating to this issue, and, therefore, based upon *Steffen*, this proposition is overruled.

***Independent Sentence Review***

**{¶ 58}** In his seventh and eighth propositions of law Baston argues that his death sentence is not appropriate and is disproportionate to sentences imposed in similar cases. We resolve these issues pursuant to our statutorily mandated independent review. R.C. 2929.05(A).

**{¶ 59}** The trial court found that the two counts of aggravated murder were allied offenses, and sentenced Baston to death on Count Two, the aggravated murder of Chong Mah in the course of an aggravated robbery. The evidence of record supports the finding that Baston committed the aggravated murder of Chong Mah, while Baston was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery. Moreover, the evidence establishes that Baston was the principal offender in the aggravated murder.

**{¶ 60}** Against this aggravating circumstance we weigh the nature and circumstances of the offense, the history, character, and background of the offender, and the applicable factors enumerated in R.C. 2929.04(B)(1)-(7). It is undisputed that only R.C. 2929.04(B)(4) (youth of offender) and R.C. 2929.04(B)(7) (other relevant factors) are implicated in this case.

**{¶ 61}** We find that the nature and circumstances of the offense do not offer mitigating value. Baston shot Chong Mah in the back of the head at a range of two to three inches with a .45 caliber revolver.

**{¶ 62}** Several of Baston's relatives and acquaintances testified about his history, character, and background. Baston's biological father, Edward L. Sample, testified that he never saw Baston until he (Baston) was about a year old. Baston's parents never married. Baston's father spent very little time with him. Baston's biological mother was unstable, and Baston stayed mostly with his maternal grandmother, although Baston lived with his father and his father's wife for short periods of time when he was one or two years old. Eventually Baston's biological parents gave up their parental rights and let his father's sister (Baston's aunt) adopt him.

**{¶ 63}** Baston's brother (through adoption), Richard R. Baston, was twelve years older than Baston. Richard testified that Baston never really felt like he was a part of their family. He recalled that on one occasion, while Baston was living with his biological father, Baston was taking a bath and was held under the water for a period of time by his father. Richard also recalled that Baston was severely beaten, which led to Richard's mother asking Baston's father whether she could adopt Baston. Richard felt that Baston never got over being rejected by his parents. Richard also felt the court system failed Baston when Baston first got into trouble as a juvenile.

**{¶ 64}** Baston participated in church activities with the Glass City Church of Christ. One of the youth advisors, Wayne D. Henderson, knew Baston through the church and related that Baston was very artistic. Baston would do what he was told, and he never had any problems with him. Baston interacted well with children. The minister of the church, Rick Hunter, told the panel that Baston had done some artwork for books that Hunter was writing and that Baston was always cooperative and willing to help on projects. Baston had attended church regularly prior to his arrest, and the minister had been meeting Baston regularly since his arrest.

**{¶ 65}** Baston's high school counselor told the court that Baston had a good heart, but that his past would get in his way. Baston could not get beyond the fact that his biological parents had deserted him.

**{¶ 66}** Tommie Davis, Baston's adoptive mother, obtained custody of Baston when he was two. While visiting her brother (Baston's father), she noticed that Baston was treated differently than her brother's other children, and thereupon asked for custody of him. When she picked Baston up to take him home with her, he was wearing wet underwear and a dirty undershirt. He had no clothes. Tommie was not married at the time, but later married Leroy Davis, who never acted like a father toward Baston.

**{¶ 67}** We accord some mitigating weight to Baston's history, character, and background evidence. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 692 N.E.2d 151, 166; *State v. Goff* (1998), 82 Ohio St.3d 123, 141, 694 N.E.2d 916, 930.

**{¶ 68}** Baston made an unsworn statement in which he apologized to the Mah family and asked them for forgiveness. We accord this retrospective remorse very little weight in mitigation. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 686-687, 687 N.E.2d 1358, 1374; *State v. Raglin* (1998), 83 Ohio St.3d 253, 273, 699 N.E.2d 482, 498; *State v. Post*, 32 Ohio St.3d at 394, 513 N.E.2d at 768.

**{¶ 69}** The parties stipulated that Baston's date of birth was February 8, 1974, making him twenty years old at the time the crime was committed. R.C. 2929.04(B)(4) provides that the youth of the defendant can be considered a mitigating factor, and we determine this factor is entitled to some weight. Finally, residual doubt is not an acceptable mitigating factor. *State v. McGuire*, at syllabus; *State v. Goff*, 82 Ohio St.3d at 131, 694 N.E.2d at 923.

**{¶ 70}** Although appellant's mitigation evidence is entitled to some weight, it is insufficient to overcome the single aggravating circumstance, murder during the course of an aggravated robbery, proven beyond a reasonable doubt in this case.

{¶ 71} Finally, R.C. 2929.05(A) requires that we review the sentence in this case and determine whether it is proportionate to the sentence imposed in similar cases. Since 1985, when we found the death sentence of Ernest Martin (*State v. Martin* [1985], 19 Ohio St.3d 122, 19 OBR 330, 483 N.E.2d 1157) to be appropriate and proportional for an aggravated murder during the course of an aggravated robbery, this court has reviewed a plethora of cases in which aggravated robbery is the sole aggravating circumstance. See, *e.g.*, *State v. Byrd* (1987), 32 Ohio St.3d 79, 512 N.E.2d 611; *State v. Dennis* (1997), 79 Ohio St.3d 421, 683 N.E.2d 1096; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180. Baston's case is similar in facts to those cases, and the mitigating factors presented do not distinguish the death sentence in his case as disproportionate.

{¶ 72} Accordingly, for all of the foregoing reasons, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs separately.

—————————

**PFEIFER, J., concurring.**

{¶ 73} I concur because I disagree with the majority's statement that "residual doubt is not an acceptable mitigating factor." For the reasons stated in my concurrence in *State v. McGuire* (1997), 80 Ohio St.3d 390, 405-406, 686 N.E.2d 1112, 1124, I believe residual doubt to be an important mitigating factor in our death penalty analysis. However, I do not believe that residual doubt is a factor in this case.

**APPENDIX**

**{¶ 74}** "**Proposition of Law No. 1:**  A jury waiver in a capital case is not knowing, intelligent, and voluntary unless the record indicates that the defendant is aware that error in the admission of evidence will be held harmless on appeal unless it is affirmatively shown that the three-judge panel hearing the case relied in its decision on the inadmissible evidence.

**{¶ 75}** "**Proposition of Law No. 2:**  Evidentiary Rulings at the guilt phase of a capital trial, even a trial before a three-judge panel, can deprive a defendant of his rights under the Constitutions of the United States and of the State of Ohio.

**{¶ 76}** "**Proposition of Law No. 3:**  A prosecutor may not argue uncharged death specifications during closing argument at the mitigation phase of a capital trial and may not urge a three-judge panel to refuse to perform its statutory duty.

**{¶ 77}** "**Proposition of Law No. 4:**  When the R.C. 2929.03(F) opinion of a three-judge panel in a capital case explicitly indicates that the weighing of the aggravating circumstance against the mitigating factors was skewed by improperly considered victim impact statements, unwarranted speculation about the likelihood of future criminal behavior by the defendant, and erroneous treatment of the nature and circumstance of the offense as a factor to be weighed against mitigation, the panel has failed in its function as a gatekeeper and displayed the sort of bias against the defendant which makes the panel's determination of the appropriate sentence a sham and required that the sentence of death be vacated.

**{¶ 78}** "**Proposition of Law No. 5:**   Ohio death penalty law is unconstitutional both in the abstract and as applied.

**{¶ 79}** "**Proposition of Law No. 6:**  Ohio's death penalty law as applied violated R.C. 2929.05(A) by requiring appellate courts and the Supreme Court, in conducting their R.C. 2929.05(A) review of 'similar cases' for proportionality, to review only those in which a sentence of death was imposed and ignore those in which a sentence of life with parole eligibility after twenty full years or life with parole eligibility after thirty full years was imposed.  This application of R.C.

2929.05(A) also violates the rights to fair trial and due process and results in the imposition of cruel and unusual punishment as set forth in the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

{¶ 80} "**Proposition of Law No. 7:** When independent review of the death sentence in a capital case reveals that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt, the sentence of death must be reversed.

{¶ 81} "**Proposition of Law No. 8:** A death sentence is wrongly imposed and will be reversed when it is inappropriate and not proportional to the sentence imposed in similar cases."