OPINION
In this case, Defendant/Appellant, Thomas Tyrone Henderson, appeals from his conviction, after a jury trial, on charges of intimidation of a crime victim and assault. The charges arose from Henderson's relationship with Anna McGhee, who began dating Henderson in early 1998. Henderson did not testify at trial. McGhee's account was that she ended their relationship on April 9, 1998. That evening, Henderson came to McGhee's home and they argued over the breakup. The argument ended with McGhee pushing Henderson out the door. However, Henderson's coat was caught and he began banging loudly on the door. McGhee opened the door, hit Henderson, and knocked his glasses off. After McGhee closed the door, she heard several shots fired into the air. McGhee then called the police and filed an aggravated menacing charge against Henderson.
According to McGhee, Henderson harassed her at work and at home after she filed the menacing charge. The harassment occurred in person and over the telephone on various occasions. Henderson told McGhee that he did not hurt anyone and did not deserve to go to jail. On May 18, 1998, Henderson tried to run McGhee off the road as she drove home from her brother's house. Shortly afterward, he came to McGhee's house and told her that she had better "stay away from the courts." He also threatened to harm her. As a result, McGhee again called the police, who came to her home in the early morning hours of May 19, 1998. During the time the police were there, Henderson made several more calls to McGhee. Henderson also drove up and down McGhee's street in different cars while the police were there, waving as if he were in a parade. However, the police were not able to catch him. McGhee testified that this made her realize how vulnerable everyone, including her mother, was. She testified that she dropped the aggravated menacing charge the day after the May 18-19 incidents because she was afraid and was frustrated. However, the charge was actually not dismissed until July 8, 1998.
In the meantime, Henderson was indicted by the Grand Jury for intimidation of a crime victim on June 2, 1998. Between May 19, 1998 and July 17, 1998, McGhee continued to see Henderson, even after a restraining order had been issued. She denied dating Henderson after April 9, 1998. Her explanation was that she allowed some continued contact because she feared for her safety and that of her family, i.e., she felt the best way to keep Henderson from harming anyone was to placate him.
On the evening of July 16, 1998, McGhee dropped her son off at work and then ran into Henderson at a gas station. At that time, Henderson threatened to harm McGhee's son if she did not accompany Henderson to his apartment. McGhee then drove to Henderson's apartment, parked her car in his garage, and went in. She also accompanied Henderson to a band practice. On the way home from the practice, Henderson drove to Triangle Park. However, before Henderson could stop his truck, McGhee jumped out and tried to run away. At that point, Henderson got out, grabbed McGhee's hair, and slammed her head against the gravel five to ten times or more. Instead of taking McGhee home or to a hospital, Henderson took her back to his apartment and helped her clean the wound. Later, he drove her home. McGhee then went to the hospital and reported that she had been assaulted.
Henderson's witnesses (most of whom were friends of Henderson) paint a somewhat different picture of the relationship. Essentially, these witnesses testified that Henderson and McGhee began dating in December, 1997, or January, 1998, and continued to date up to the time of the alleged assault on July 17, 1998. The couple was described as having a "boyfriend/girlfriend" relationship. The witnesses saw the two together at Henderson's apartment before and after the incidents in April and May. They also saw McGhee at band practices of Henderson's band in June and July. At none of these times did McGhee appear to be with Henderson under force or duress. Instead, she appeared to be relaxed and having a good time. The apartment manager of Henderson's apartment complex also testified that he frequently saw McGhee's car parked in a parking space in the garage that Henderson had paid for.
Several of Henderson's witnesses saw McGhee at the band practice on July 16, 1998. They indicated that McGhee appeared to be happy. Other women who were girlfriends of band members were also there. The women were talking, listening to the music, drinking, and dancing. In this regard, McGhee herself admitted that during the evening, she helped one of the other women with the steps to the "Electric Slide."
Concerning the incident at Triangle Park, a friend of Henderson's testified that he encountered Henderson and McGhee at Taco Bell after band practice. He followed them to Triangle Park and pulled up next to Henderson's truck, which was stopped. This individual testified that McGhee was "fussing," opened her door, and then fell out of the truck. Henderson then got out to help McGhee and told his friend that he needed to take McGhee home. Consequently, the witness left.
After hearing the above testimony, the jury found Henderson guilty of the intimidation charge, not guilty of felonious assault, guilty of the lesser included offense of assault, and not guilty of abduction. Henderson was then sentenced to three years for intimidation and six months for assault, to run concurrently. Henderson now appeals, raising the following assignments of error:
I. The trial court erred in failing to declare a mistrial where the Defendant-Appellant raised a Batson challenge to jury venire since the Defendant-Appellant's constitutional right to Equal Protection was violated by the Prosecutor's exclusion of the only black juror from the jury panel.
II. The jury's verdict and finding of guilty of the Intimidation of a Witness charge in Case No. 98-CR-1744 and the lesser included charge of Assault in Case No. 98-CR-2539 was against the manifest weight of the evidence.
After considering both assignments of error, we find them without merit and affirm the judgment of the trial court.
 I
The basis of the first assignment of error is the State's decision to remove the only African-American juror from the jury. Specifically, Henderson contends the trial court erred in finding that the State established a racially neutral basis for exclusion. According to Henderson, the prosecutor's stated reasons for excluding the juror were not persuasive and were a pretext for discrimination.
To decide if a peremptory strike is racially discriminatory, courts use the following three-part test:
 First, the opponent of the strike must make a prima facie
showing of discrimination. Second, the proponent must give a race-neutral explanation for the challenge. Third, the court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination.
State v. White (1999), 85 Ohio St.3d 432, 436, citing Batson v.Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Under the second step, the only issue is the `"facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.'" State v. Nobles (1995), 106 Ohio App.3d 246,280, quoting from Purkett v. Elam (1995), 514 U.S. 765,115 S.Ct. 1769, 131 L.Ed.2d 834. The third step then focuses on whether the State, in fact, had a discriminatory motive for the strike, bearing in mind that the strike opponent retains the burden of persuasion. White, 85 Ohio St.3d at 437. Further, because credibility determinations are involved in the third step, the trial court's factual findings are given deference. Id.
After applying the three-part test, we find no error on the trial court's part. First, while the court made no specific finding about whether a prima facie case of discrimination was established, the proffered explanation and the court's subsequent ruling on the ultimate issue moot this point. Id. Second, the prosecutor did offer a race-neutral explanation for the peremptory strike. In this regard, the prosecutor remarked on the juror's "wishy-washy" answers about his medical situation and ability to sit for sufficient periods of time. Additionally, the prosecutor noted that the juror had said he was a loner and did not get along with others. Based on these facts, the prosecutor was concerned about the juror's ability to work with others. He also felt the equivocal nature of the answers indicated that the juror did not really want to be present. And finally, the prosecutor argued that the juror's race was insignificant because both the victim and the defendant were African-American. We agree that these are facially valid reasons for excluding this juror. Moreover, they are supported by the record.
Finally, while the trial judge expressed some concern about excluding the only African-American juror, he also believed theBatson objection should be overruled because of the juror's overall demeanor. Since the trial court was in a better position than we are to assess the juror's demeanor, we defer to the trial court's finding. We further add that we find no evidence of purposeful racial discrimination in the record. Accordingly, the first assignment of error is without merit and is overruled.
 I
In the second assignment of error, Henderson contends that the jury's guilty verdicts on the intimidation charge and the lesser-included offense of assault were against the manifest weight of the evidence. In the context of manifest weight challenges, we have recently observed that:
 [w]hile a court of appeals has the undoubted power and duty to determine whether a judgment is against the manifest weight of the evidence, it should reverse a conviction only under the most exceptional circumstances. * * * Furthermore, when the factual issue involves determining the relative credibility of conflicting testimony, an appellate court must give substantial deference to the finder of fact, which saw and heard the witnesses.
State v. Bethley, (May 8, 1998), Montgomery App. No. 16070, unreported, p. 3 (citations omitted). As we also said in State v.Walden (Sept. 12, 1997), Montgomery App. No. 15956, unreported, "[o]ur authority to consider witness credibility is "extremely restrained," and we may substitute our judgment for the trier of fact's only where "it is patently apparent that the fact finder lost its way." Id. at p. 6.
After reviewing the transcript and exhibits in this case, we do not find it patently apparent that the jury lost its way. First, with regard to intimidation of a crime victim, R.C.2921.04(B) provides that:
 [n]o person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges.
If the jury believed the testimony of the complaining witness, it could have found all the elements of intimidation satisfied. As was noted above, McGhee testified that after she filed the original aggravated menacing charges, Henderson harassed her, threatened her and her family with harm, tried to run her off the road, and told her to "stay away from court." McGhee's account was supported by the testimony of her brother and the testimony of a police officer who was present when several harassing phone calls were made. Conflicting evidence did exist in the form of testimony indicating that McGhee willingly dropped the charge and continued to be romantically involved with Henderson even after a restraining order was issued. However, the jury had a better chance than we do to observe the demeanor of witnesses and to make judgments about their credibility. Based on the record before us, we do not believe this case is one of those exceptional situations meriting reversal on manifest weight grounds.
Concerning the second verdict, we note that Henderson was originally charged with felonious assault, but was found guilty only of the lesser-included offense of assault. In this context, the felonious assault statute states that "[n]o person shall knowingly * * [c]ause serious physical harm to another." R.C.2903.11(A)(1). The assault statute is similar, but omits the element of serious physical harm, i.e., R.C. 2903.13(A) says that "[n]o person shall knowingly cause or attempt to cause physical harm to another." Again, the evidence on this point was conflicting. McGhee's account, if believed, establishes all the elements needed for a jury to find that Henderson knowingly caused her physical harm. Specifically, McGhee testified that after she jumped out of the truck, Henderson attacked her, hit her head numerous times on the gravel, kicked her, and ripped her shirt. The treating physician also testified that McGhee's injuries were consistent with her testimony that her head had been repeatedly hit against the ground.
By contrast, Henderson's friend testified that McGhee opened the truck door and fell out while the truck was stopped. Although no medical opinion was given concerning whether McGhee's injuries were consistent with this account, the impact from a simple fall from a stopped vehicle seems incompatible with the injuries sustained. Specifically, McGhee's right ear lobe had a large, inch and a quarter tear going completely through the cartilage. Additionally, she had multiple bruises on her right shoulder and thigh. Moreover, a photo taken shortly after the accident shows a major tear in McGhee's shirt that is not explained by the fall from a stopped truck. Accordingly, we find more than adequate evidence to support the jury's finding that Henderson was guilty of assault. Consequently, the second assignment of error is without merit and is overruled.
Based on the preceding discussion, both assignments of error are overruled and the judgment of the trial court is affirmed.
FAIN, J., and KERNS, J., concur.
(Hon. Joseph D. Kerns, Retired from the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
George A. Katchmer, Kathleen Swiger Lenski, Hon. John Kessler