JOURNAL ENTRY and OPINION
{¶ 1} Plaintiff-appellant, Mercantil Tomas, C.A. ("Mercantil"), appeals from the defense verdict entered on its claim of tortious interference with business relationships against defendant-appellee, Swagelok Company ("Swagelok"). Mercantil challenges the trial court's rulings that excluded the testimony of plaintiff's expert witness pursuant to Evid.R. 702 and that denied Mercantil's request to submit a document for forensic examination. Mercantil also challenges the verdict alleging it was against the manifest weight of the evidence. For the reasons that follow, we affirm.
 {¶ 2} Mercantil maintains that Swagelok tortiously interfered with its business contracts to supply Swagelok product to certain customers in Venezuela. The voluminous record essentially portrays the following:
 {¶ 3} Swagelok manufactures "fluid system component technologies for a wide variety of industries." Swagelok supplies its authorized distributors, who, in turn, fulfill contracts with end users. Swagelok provides a lifetime warranty on its products, which is only effective as long as the product is selected, installed, and maintained, as indicated in the public or technical literature generated by Swagelok.
 {¶ 4} Mercantil is a reseller of Swagelok product that it obtains from the surplus stock of end users. The Swagelok warranty would cover new, unused, surplus Swagelok product; however, it would not cover used or inauthentic product.[1]
Thus, Swagelok does not guarantee the integrity of products purchased from resellers.
 {¶ 5} Mercantil is located in Venezuela, where Swagelok sought to expand its business sometime in 1997. Swagelok's business development manager, Mario Castaneda ("Castaneda"), traveled to Venezuela in March 1998. At that time, Swagelok had two authorized distributors in Venezuela, Venteca and Suministros Industrials Montes ("SIM"). Castaneda learned of a significant presence of resellers such as Mercantil. For example, Mercantil was awarded a blanket order contract to supply Swagelok parts to the PDVSA, the nationally owned oil company. Castaneda also learned of Mercantil's unauthorized use of Swagelok's copyrighted artwork in its advertising. Castaneda was also informed that Mercantil had "bogus" Swagelok product in its inventory.
 {¶ 6} Castaneda grew concerned that the resellers created possible liability for Swagelok in the event the products were tampered with or compromised. Castaneda met with purchasers of Swagelok product, including some customers of Mercantil, to essentially inform them of the risks of buying Swagelok product outside authorized channels, i.e., through resellers. Castaneda also met with attorneys and the superintendent of the Procompetencia (the Venezuelan equivalent to the FTC) concerning the information he had received about Mercantil.
 {¶ 7} In 1998, Swagelok instituted administrative proceedings against Mercantil through the Procompetencia. Swagelok charged Mercantil of unauthorized use of Swagelok's logo and graphic images in Mercantil's advertising, of engaging in product simulation, of holding itself out as an authorized Swagelok representative, and of delivering false certificates with its products and for predatory pricing. The Procompetencia conducted an investigation and appointed three experts to examine Mercantil inventory. Mario Castenada, a Swagelok representative, responded to a series of expert questions concerning Swagelok's products. The Procompetencia issued various findings against Mercantil, which Swagelok summarized in correspondence to customers.
 {¶ 8} According to the parties, the Procompetencia decision has been confirmed by at least two courts in Venezuela and remains pending on appeal at another judicial level. Mercantil's claim in this case stems from its belief that Swagelok obtained the Procompetencia decision by a fraudulent conspiracy to interfere with Mercantil's contracts with its customers.[2]
 {¶ 9} We address the assignments of error in the order presented for our review.
 {¶ 10} "I. The trial court erred in excluding the expert testimony of Cecilia V. Irwin on the basis of competence."
 {¶ 11} "Evid.R. 702(B) addresses the qualifications necessary to accord a witness `expert' status. Under the rule, a witness may qualify as an expert by reason of her knowledge, experience, skill, training, or education. Neither special education nor certification is necessary to confer expert status upon a witness. See State v. Boston (1989), 46 Ohio St.3d 108, 119,545 N.E.2d 1220, 1231-1232. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge she possesses will aid the trier-of-fact in performing its fact-finding function. State v. D'Ambrosio
(1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915." State v.Baston (1999), 85 Ohio St.3d 418, 423.
 {¶ 12} We will not overturn the trial court's determination as to whether an individual qualifies as an expert absent an abuse of discretion. Id., citing Evid.R. 104(A) and State v.Williams (1983), 4 Ohio St.3d 53, 58. Mercantil admits that Irwin has no professional degree, license, or other formal credentials. Accordingly, we must ascertain whether she possessed knowledge that would have aided the trier-of-fact in determining whether Swagelok tortiously interfered with Mercantil's business relationships.
 {¶ 13} Mercantil proffered that the testimony of Ceclia Irwin would establish that Mercantil's inventory of Swagelok fittings were authentic. This testimony, Mercantil argues, would have aided the jury in determining that Swagelok acted wrongfully when it initiated the Procompentencia investigation that ultimately resulted in a finding that Mercantil sold simulated Swagelok fittings. Irwin's testimony would not have aided the trier-of-fact in that regard.
 {¶ 14} First, Irwin bases her qualification as an expert entirely upon her years of experience as a salesperson in the surplus fittings market. She has never worked for Swagelok. She has never purchased parts from any salesperson authorized to sell Swagelok products. She has never designed a valve or fitting similar to Swagelok's product. Irwin has never authored any papers on the topic of her purported expertise nor has she given any lectures on the subject. No court had ever qualified her as an expert in that field and she has no specialized training in metals, engineering, or mechanics.
 {¶ 15} Irwin's experience with and/or knowledge of Swagelok fittings derives exclusively from her involvement with companies that resell products. While she claims to have engaged in exercises of product identification during her sales career, there is no proof that this created in her a specialized ability to perform that task with any level of accuracy. At best, it establishes a frequent exposure to what purports to be Swagelok product. Accordingly, the trial court acted within its discretion in determining that Irwin did not qualify as an expert in Swagelok product identification.
 {¶ 16} We find the exclusion of Irwin's opinion was further proper pursuant to Evid.R. 702(C)(3) that requires:
 {¶ 17} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 18} "* * *
 {¶ 19} "* * *
 {¶ 20} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 21} This provision dovetails with the evidentiary principle set forth in Evid.R. 403(A) that relevant evidence is inadmissible if it is unduly prejudicial, confusing, or likely to mislead the jury. See Telxon Corp. v. Smart Media of Del.,Inc., Summit App. Nos. 22098 22099, 2005-Ohio-4931, ¶ 21.
 {¶ 22} Irwin based her opinion in this case on her 45-minute inspection of some parts kept at the Procompetencia in Venezuela. Irwin stated she was required to examine the parts through plastic bags. During the inspections, she utilized a list of parts obtained from a notary employed by plaintiff Lucil. Irwin was unable to identify the source or origin of it and did not know if it included all the parts examined by the three Procompetencia experts.
 {¶ 23} Irwin only examined a portion of the nearly 200 parts with any specificity.[3] Consequently, she admitted at deposition that some of the parts in those boxes may not have been genuine Swagelok parts. If so, her own conclusions about the authenticity of Mercantil's Swagelok fittings is not necessarily accurate. Therefore, the inspection she employed to reach her conclusion cannot be considered to have been conducted in a way that would yield an accurate result as required for admissible expert testimony.
 {¶ 24} Assignment of Error I is overruled.
 {¶ 25} "II. The jury verdict finding that defendant Swagelok was justified in its intentional interference with plaintiff's business relationships was against the manifest weight of the evidence."
 {¶ 26} In a civil context, we review a manifest weight challenge to determine whether it is supported by competent, credible evidence. State v. Schiebel (1990), 55 Ohio St.3d 71,74. "An appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court judge." Id., citing Seasons Coal Co.v. Cleveland (1984), 10 Ohio St.3d 77, 80; C.E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279.
 {¶ 27} Because civil and criminal matters involve different burdens of proof, it stands to reason that the evidence necessary to support the respective judgments would differ accordingly. More evidence would be necessary to sustain a criminal judgment, since the standard of proof in a criminal trial is higher than in a civil trial. See In re Estate of Worstell (2003),100 Ohio St.3d 1258, dissenting opinion.
 {¶ 28} A claim of tortious interference with business relationships requires proof of the following elements: "(1) a business relationship, (2) known to the tortfeasor, and (3) an act by the tortfeasor that adversely interferes with that relationship, (4) done without privilege and (5) resulting in harm." Telxon Corp. v. Smart Media of Del., Inc., Summit App. Nos. 22098 22099, 2005-Ohio-4931, ¶ 88, citing BrookesideAmbulance, Inc. v. Walker Ambulance Serv. (1996),112 Ohio App.3d 150, 155-56; see, also, Kenty v. Transamerica PremiumIns. Co. (1995), 72 Ohio St.3d 415. The fourth element has also been phrased as a "lack of justification" for the interference.Fred Siegel Co., L.P.A. v. Arter Hadden (1999),85 Ohio St.3d 171, 175.
 {¶ 29} A qualified privilege may be asserted in tortious interference cases. Andrews v. Carmody (2001),145 Ohio App.3d 27, 33. Plaintiff bears the burden of proving that defendant's alleged interference lacked justification. Id., citing Doyle v.Fairfield Machine. Co., Inc. (1997), 120 Ohio App.3d 192, 217. Plaintiff must demonstrate "the existence of malice on the part of the defendant by clear and convincing evidence." Id., citing AB-Abell Elevator, 73 Ohio St.3d at 11-12 (further noting that "malice is defined as acting with knowledge that the statements that were made were false or acting with disregard as to the truthfulness or falseness of the statements.")
 {¶ 30} "[T]he following factors should be considered [in determining the existence of malice]: the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff, the interests sought to be advanced by the defendant, the social interests in protecting the defendant's freedom to act, the contractual interests of the plaintiff, the proximity or remoteness of the defendant's conduct to the interference, and the relationship between the parties. Fred Siegel,
85 Ohio St.3d, at paragraph three of the syllabus." Id.
 {¶ 31} In this case, the jury determined that Swagelok's interference was justified. Mercantil challenges that finding. In doing so, Mercantil focuses on the testimony of Mr. Mario Castaneda, which Mercantil believes is inconsistent and incredible. Having reviewed the entirety of his testimony and the record, we do not believe the judgment was against the manifest weight of the evidence.
 {¶ 32} Mercantil takes exception with Castaneda's statements in the course of the proceedings that all Swagelok parts would bear the Swagelok logo stamp. Castenada confirmed his responses to expert questions that Swagelok products are stamped, including the ferrules. However, a review of the record reflects that Castaneda admitted, in the presence of the jury, that older parts would not be stamped. Specifically, Castenada acknowledged on cross-examination that some older ferrules, pre-1987, were not stamped. He explained that he answered the expert questions based on current production due to the present tense format of the questions. Mercantil fully explored this aspect of his testimony on cross-examination. Castenada also testified about an April 8, 1999 fax of a March 18, 1999 letter, which included a response to expert questions that "[t]he ferrules started to be marked ten years ago. That would be approximately 1999. It is for this that today, although it is not impossible, it is difficult that a ferrule unmarked has not been used." (Tr. p. 1001.)
 {¶ 33} Mercantil also contends that Swagelok misrepresented the extent of its warranty from fittings brought from secondary sources. The record does not support this contention.
 {¶ 34} Castaneda expressed a concern about resellers (including Mercantil) creating a potential liability for Swagelok through tampering with, and thereby compromising products. Although Mercantil cross-examined him as to whether this was a "pretend concern to destroy the competition posed by Mercantil," Castaneda denied it.
 {¶ 35} Castaneda admitted that he went to Venezuela to tell people of the danger for compromised integrity of products from resellers in general. Inauthentic products include intermixed products (those containing parts other than Swagelok) or previously installed components in the sense that they are not unused/new. Swagelok fittings, which are not new or are intermixed, are sometimes referred to as "simulated product." Castaneda freely acknowledged Swagelok's efforts to inform purchasers of its products about the risks involved in acquiring product through non-authorized channels, including that Swagelok could not guarantee the integrity of the product in general.
 {¶ 36} Castaneda's testimony includes that he became aware of unfair trade practices by Mercantil, including misuse of copyright materials and simulated product. Castaneda maintains that he saw bogus product in Mercantil inventory. Three experts found that Mercantil had simulated product in its inventory. The governmental agency issued a decision with that and other findings of unfair trade practices.[4]
 {¶ 37} Mercantil believes Swagelok made all this up as part of a conspiracy against it and then purposely provided false information (about the presence of stampings on ferrules) to the Procompetencia to secure a favorable decision.[5] Yet, Mercantil presented its evidence to that effect and argued its position to the jury. The jury rejected that theory and instead accepted the evidence to the contrary, which included Swagelok's proffered reasons for instituting an investigation into Mercantil's business practices. Similarly, Mercantil fully developed the alleged inconsistencies between Castaneda's trial and deposition testimony for the jurors' consideration. Accordingly, the jury's verdict that Mercantil failed to establish a lack of justification for the interference is not against the weight of the evidence.
 {¶ 38} Assignment of Error II is overruled.
 {¶ 39} "III. The court erred in denying the motion of plaintiff Mercantil Tomas, C.A. for an order requiring the submission of questioned document for forensic examination."
 {¶ 40} Mercantil accuses Swagelok of fabricating a facsimile dated March 17, 1999 forwarding various questions to Castaneda. The trial court denied Mercantil's request to submit the document for forensic examination the weekend before trial. Mercantil believes if it could establish that the document was fabricated in 2005 this would prove their conspiracy theory and establish that Swagelok wrongfully manipulated the Procompetencia proceedings.
 {¶ 41} The trial court has considerable discretion in the regulation of discovery. Manofsky v. Goodyear Tire Rubber Co.
(1990), 69 Ohio App.3d 663, 668. We will not reverse a trial court's ruling on discovery absent an abuse of discretion.Lightbody v. Rust (2000), 137 Ohio App.3d 658. "`Abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140.
 {¶ 42} According to the record, Swagelok agreed not to use this document during the proceedings before the jury. Mercantil's request to submit the document for forensic examination came on the eve of trial and involved sending the document out of town. Further, the analysis was directed towards testing the validity and/or regularity of the proceedings in Venezuela, which the parties agreed would not be re-litigated in this forum. Under these circumstances, we cannot say that the trial court committed an abuse of discretion.
 {¶ 43} Assignment of Error III is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, J., and Calabrese, Jr., J., concur.
[1] Inauthentic products include intermixed products (those containing parts other than Swagelok) or previously installed components in the sense that they are not unused/new. Swagelok fittings, which are not new or are intermixed, are sometimes referred to in the industry as "simulated product."
[2] We note that Swagelok has filed cross-assignments of error to defend the judgment pursuant to R.C. 2505.22; one of which invokes the doctrine of international comity. Since it is not necessary for us to reach these errors, we take no position on their possible merit.
[3] At one point during her deposition, Irwin estimated she examined less than 25% of the 200 parts. At another, she indicated she may have inspected around 10% of the fittings.
[4] Although the parties advise that the decision remains pending on judicial appeal in Venezuela, we are unaware of the current status of this foreign judgment.
[5] Mercantil apparently presumes, as they have not pointed to any support in the record, that every part that the experts determined to be simulated was a pre-1987 ferrule.