JOURNAL ENTRY AND OPINION
{¶ 1} Appellant, Angela Garcia, timely appeals her convictions by a jury on two counts of aggravated murder[1], two counts of murder and three counts of aggravated arson.[2] For the reasons that follow, Garcia's eleven assignments of error are overruled and the judgment of the trial court is affirmed.
{¶ 2} On the evening of November 20, 1999, Garcia and her two daughters, Nyeemah, three years old, and Nijah, aged two, were at their home located on Harvard Avenue, Cleveland, Ohio. Before night's end, the home was destroyed by fire, the two young girls dead from smoke inhalation, and Garcia the only survivor. Though the fire was initially ruled accidental by the Cleveland Fire Department, one month later that conclusion was changed to fire by arson after investigators conducted an in-depth investigation as to its cause and origin. The fire occurred on a Saturday and the remaining parts of the house were razed by the city on Monday, two days after the fire. Photographs of the scene, inside and outside the house, were taken either immediately after the fire had been extinguished or the next day, Sunday. Tr. 1736.
{¶ 3} In February 2000, Garcia was indicted for having intentionally set the fire in order to collect insurance proceeds and for causing the death of her children as part of that plan. At trial, Garcia maintained the fire was accidental and that she tried to save her girls, but could not because of the fire's intensity.
{¶ 4} At trial, the evidence revealed that, between the time of the fire and the conclusion of the arson investigation, Garcia had told varying and contradictory accounts of what occurred on the night of the fire and how it was that only she escaped. The state presented more than fifty witnesses, some of whom were eyewitnesses who saw or spoke to Garcia outside the house while it blazed.
{¶ 5} Renita Jernigan, who was in the area visiting a relative, stopped after she saw the house ablaze and Garcia standing outside screaming for help. Tr. 868. When asked what Garcia said to her, Jernigan stated:
 {¶ 6} A: I heard her say — I went to her. She was hollering about her children. I asked her where are her children. She said she had them upstairs in the bathroom with her. I told her, where was they at. I said how did she get out and the kids left in the house.
{¶ 7} * * *
{¶ 8} Q: Now what all did she say?
 {¶ 9} A: She said she had the kids and when she was trying to get out, they got out of her arms some kind of way.
 {¶ 10} Q: Did she say where she was when she had the kids?
{¶ 11} A: In the bathroom.
{¶ 12} * * *
 {¶ 13} Q: What did she say happened next then? How did she get out?
{¶ 14} A: She climbed out the bathroom window.
{¶ 15} * * *
 {¶ 16} Q: What happened to the kids? Did she explain?
{¶ 17} * * *
 {¶ 18} A: She said she had both her children in her arms. When she was climbing out the bathroom window, they got out of her arms.
{¶ 19} Tr. 874-875.
{¶ 20} Another witness, Sakina Fails, a long-time friend of Garcia, told the jury that Garcia said she escaped through the front door of the house, not the bathroom window. Tr. 922. Fails also stated that later when Garcia was talking to police at the scene Fails heard her tell them that she went out the second story front bedroom window onto the roof and then jumped down to the ground. Tr. 927. Firefighter, John Hlatky, however, testified that when he first entered the second floor front bedroom, he was the one who broke out the window Garcia claimed to have shattered in order to escape. Tr. 772, 797, 800, 807.
{¶ 21} Other witnesses testified that Garcia was inconsistent about the conditions in the house before she escaped. Chris Szabo, an insurance claims adjuster, stated Garcia told him that when she opened the bathroom door, all she could see was smoke. Tr. 1395. On the other hand, Garcia told fire investigator, Albert Lugo, that she had been in the bathroom when she started to cough. When she left the bathroom, she told him she could see enough to see that the television was on. Tr. 1338-1340. Lugo stated that he was troubled by Garcia's recounting of the events because, typically, you would not feel the effects of a fire, namely coughing, before seeing smoke. Tr. 1338.
{¶ 22} Several witnesses testified that Garcia did not show any of the signs of having been in a fire. People who spoke with Garcia while the fire raged, stated that her clothes were virtually spotless and she did not have any physical symptoms such as coughing, irritated eyes, or running nose. Tr. 680, 917, 919, 1019, 1024-1026, 1195-1199, 1346-1347, 2056, 2058-2059. With the exception of a small cut on her forearm, Garcia's physical appearance and condition did not coincide with her version of how long she was exposed to the conditions inside the house or how she escaped the structure from the broken second floor window. Tr. 1339-1344, 1390, 1396, 1548, 1841-1842, 3047.
{¶ 23} The state also presented evidence about the condition of Nyeemah, the three-year-old, when she was found. Firefighters and other hospital personnel testified that Nyeemah had been found with her sister in the upstairs front bedroom. Both children were found near one of the side windows. Nyeemah was located directly beneath the window, with some type of venetian blinds having melted down on her. The evidence showed that the cord from the blinds was wrapped around her. Tr. 584, 658, 700, 737, 775, 804, 812. Unlike Garcia's first two trials, the state used a dummy to show the jury in the third trial how the child was wrapped with this cord. Ann Sturges, the registered nurse who attended to Nyeemah when she was brought in by EMS, described the cord:
 {¶ 24} It was wrapped around her left arm twice and then it was all the way around her body, over her right arm, back around over her right arm, so both hands you [sic] were down to her side, and then down around her left leg.
{¶ 25} Tr. 1186. William Proctor, the EMS attendant, stated that the cord was way too tight for a child to wrap themselves up in. Tr. 1130, 1136-1137. Other hospital personnel confirmed that, after Garcia went into the viewing room where her two girls were placed before being transported to the coroner's office, the cord from Nyeemah's body was missing. Tr. 1120, 1168-1169, 1175.
{¶ 26} The state presented expert witnesses who, after reviewing photographs and statements made by Garcia to fire and police personnel, opined on the cause and origin of the fire.[3] One of Garcia's statements revealed that, immediately after the fire, she told fire personnel that before the fire began she had been talking on a three-way call in the dining room where she had candles burning. Tr. 921, 1331-1333, 2517, 2528, 3185. Evidence confirmed Garcia's claim that she had been on the phone just minutes before the fire broke out; however, the state's experts testified that the fire had been intentionally set by the use of accelerants.[4] These experts concluded that the fire was the result of arson because they had found evidence of two separate fire being started in two different locations within the house. All six of the state's cause and origin experts[5] concluded that two accelerants had been used to ignite the fires: one in the dining room and one near the stairway leading to the second floor. Tr. 1369-1370, 1376, 1548, 1560, 1570-1572, 1757, 1837, 2851-2854, 2865, 2872-2873, 2960.
{¶ 27} Garcia presented expert testimony also confirming that the candle(s) had most likely fallen over and caused the fire. Tr. 3362-3365. Another of Garcia's experts testified that the cause of the fire was indeterminate. Both of Garcia's experts, however, agreed that there was no evidence of the fire being intentionally set because there was no conclusive proof that any accelerants had been used. Tr. 3256-3257, 3370-3379.
{¶ 28} Testifying for the state, Alto Parnell, an employee of ADT Security Systems, established that, just minutes before the first 911 call about the fire, the tamper code on the alarm system at Garcia's house was triggered. Tr. 1092. Parnell testified that the tamper code is set off if the device is disturbed by either moving it or pulling its wires out. Tr. 1092. On cross-examination, Parnell conceded that, if the wires of the alarm's key pad are burnt, that might also cause the tamper code to be triggered. Tr. 1094.
{¶ 29} Garcia's expert, Dr. Richard Roby, a mechanical/chemical engineer, indirectly confirmed that the alarm's tamper code could be related to the incendiary environment during the fire rather than someone tampering with it. Roby testified that when ADT called the Garcia house after it received the tamper code, it got a busy signal because the alarm's wires were burning. Tr. 3212.
{¶ 30} In order to support its theory of arson, the state also presented evidence of Garcia's possible motive for committing arson. Sakina Fails testified that Garcia was employed as a contents specialist by her stepfather's fire damage repair business, Sabur Builders. Tr. 933. Fails stated that she had gone to Garcia at one time for help in filling out claim forms related to a fire she had. Tr. 946, 948.
{¶ 31} Dan Curtin, an adjuster and property specialist with Erie Insurance Company, testified that in October, a month before the fire, Garcia had taken out an unusually high renter's insurance policy for $40,000. Tr. 1637-1638. The evidence also established that only seventeen days before the fire on November 3, 1999, Garcia had taken out a $50,000 insurance policy on herself which included two $5,000 rider provisions covering each of her girls. Tr. 2272-2274.
{¶ 32} Mortgage broker, Tom Weiss, told the jury that approximately one month before the fire, Garcia had applied for a mortgage on the Harvard property. Garcia told Weiss that she had a monthly income of $2,200. Tr. 2189-2190. The day of the fire, Garcia called him to ask about the status of her application and was told that everything looked fine. Weiss explained to the jury that had the fire not happened and the mortgage been approved, Garcia would have been responsible for the monthly mortgage payment. Tr. 2199.
{¶ 33} Despite Garcia's representation to Weiss that she was earning more than $2,000 a month, she told Mary Tabakow of the Cuyahoga County Department of Human Services, that she needed welfare assistance. Tr. 2134, 2173. Garcia represented to Tabakow that she was working for Sabur Builders and was, therefore, meeting the minimum 30-hour weekly work requirement in order to continue qualifying for welfare benefits.
{¶ 34} Brian Clark, a recruiter for the United States Navy, testified that in June 1999, Garcia had inquired about joining the Navy and was told that she could not enlist if she had custody of any children. Tr. 2426-2429. Arson Detective, Ralph Peachman, testified that he learned Garcia had unsuccessfully taken steps to try to transfer custody of Nyeemah and Nijah to her sister, Judith Nichols. Tr. 1729.
{¶ 35} Curtin stated he met with Garcia two days after the fire and the death of her two children to discuss her insurance claim on the recently obtained policy. During that meeting, Curtin stated that Garcia seemed pretty cheerful. Tr. 1642-1643. Only ten days or so after their meeting, Curtin told the jury that Garcia had called saying that she had filled out all the claim forms. Curtin met with Garcia again to pick up the forms.
{¶ 36} In reviewing the forms, Curtin stated that Garcia's property loss claim amounted to about $64,000 and that virtually all the item prices were high. Curtin commented that not only did Garcia not have any receipts for the various items, but when the different retail merchants were called, none of them could verify selling anything to Garcia. Tr. 1643-1648, 1652-1661, 1667-1669, 1743.
{¶ 37} One of Garcia's neighbors testified that the day before the fire, he saw people from Sabur Builders moving large pieces of furniture out of Garcia's house. Tr. 1885. Eric Pfeil, claims manager for Progressive Insurance and agent for Sabur Builders and Garcia, said that, in less than a year, he had processed five other insurance related claims made by Garcia or people named in her policy. Tr. 1910-1912.
{¶ 38} One of the state's final witnesses, Tonya Lanum, testified that she had spent time incarcerated in the same facility as Garcia. While in jail awaiting trial, Garcia eventually spoke about the fire and the deaths of her two girls, according to Lanum. Lanum told the jury that Garcia admitted to setting two fires in the house and when the first one got out of control, she left, leaving her girls behind. Lanum said that Garcia said it was an insurance thing and that she did not mean for her children to be hurt. Tr. 2580-2582.
{¶ 39} Mark McCrary, a crime-scene analyst, testified that, in his expert opinion, the fire had all the earmarks of being an arson for profit. Tr. 2771-2772.
{¶ 40} Garcia was convicted for the aggravated murder of her two children, aggravated arson, and insurance fraud. Garcia was sentenced and then filed this timely appeal in which she presents eleven separate assignments of error.
{¶ 41} FIRST ASSIGNMENT OF ERROR
 {¶ 42} The trial court erred when it allowed a crime scene analyst to testify and to provide opinions tantamount to profiling for consideration by the jury.
{¶ 43} SECOND ASSIGNMENT OF ERROR
 {¶ 44} The trial court erred when it allowed a forensic auditor to testify and to provide opinions tantamount to profiling for consideration by the jury.
{¶ 45} In her first and second assignments of error, Garcia contends that the trial court erred by allowing inadmissible testimony by two of the state's witnesses, Mark McCrary and Ronald Saunders. Garcia claims that the trial court should not have allowed the witnesses to testify because they do not qualify as experts. We reject both arguments.
{¶ 46} Admissibility of expert opinion testimony is governed by Evid.R. 702 and 704 and, more generally, by Evid.R. 402 and 403. See, Schaffter v. Ward (1985), 17 Ohio St.3d 79, 477 N.E.2d 1116. Evid R. 702 requires that (1) the witness's testimony be related to matters beyond the knowledge or experience of a layperson; (2) the witness have specialized knowledge, skill, experience, training or education regarding the subject matter of the witness's testimony; and (3) the witness's testimony be based on reliable scientific, technical, or specialized information. State v. Campbell (Mar. 15, 2002), Hamilton App. Nos. C-010567, C-010596.
{¶ 47} To be admissible, expert testimony must "assist the trier of fact in determining a fact issue or understanding the evidence." Campbell, supra citing Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607, 611, 687 N.E.2d 735. Evid.R. 702 "is rooted in the fact that the jury is unable to draw proper inferences from the facts in certain situations. Campbell, supra.
The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth." State v. Tomlin (1992),63 Ohio St.3d 724, 728, 590 N.E.2d 1253, quoting Alexander v. Mt. Carmel Med. Ctr. (1978), 56 Ohio St.2d 155, 159, 383 N.E.2d 564. Further, as Schaffter noted,
 {¶ 48} [i]n a more general sense, admissibility of expert testimony is governed by Evid.R. 402 and 403. Pursuant to Evid.R. 402, all relevant evidence is admissible, subject to enumerated exceptions * * *. Correspondingly, Evid.R. 403 provides for the exclusion of even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue influence or needless presentation of cumulative evidence.
{¶ 49} Schaffter, supra at 80. Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only by proof of an abuse of discretion. State v. Williams (1983), 4 Ohio St.3d 53, 58, 446 N.E.2d 444,448. In the case at bar, Evid.R. 702(A) is satisfied because, typically, issues relating to the cause and origin of a fire are beyond the knowledge and experience of lay persons.
{¶ 50} Next, Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function. State v. Hartman (2001), 93 Ohio St.3d 274, 754 N.E.2d 1150; State v. Baston (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128, 133. Of course, an expert is prohibited from providing testimony which invades the province of the jury. State v. Coulter (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324.
{¶ 51} In the case at bar, we first note that neither McCrary nor Saunders testified about anything other than the charge of arson. McCrary testified the fire was an arson and Saunders testified that Garcia had a financial motive for committing arson. Our review, therefore, is narrowly limited to deciding whether their testimony was improper with regard to the crime of aggravated arson, not any of the other crimes for which Garcia was tried.
{¶ 52} Upon Garcia's objection to McCrary's testimony, the trial court correctly conducted a voir dire examination in order to determine whether he qualified as an expert. McCrary testified that though he regards himself as a criminal profiler, his role in the case at bar was to provide an expert opinion based upon his criminal investigative analysis of the evidence in the case. McCrary stated that he became experienced in crime scene analysis during his 25 years with the FBI. McCrary admitted that he is not an arson expert. Tr. 2784. When asked why he believed his expert opinion would assist the jury, McCrary stated that it would help the jury understand issues such as * * * potential motive * * *. Tr. 2712-2714. The trial court qualified McCrary as an expert and permitted him to articulate his opinion about why the fire occurred. Tr. 2748.
{¶ 53} At trial, McCrary testified that crime scene analysis requires one to look at the totality of the circumstances surrounding a crime, namely, interviewing witnesses, using informants, investigation of the evidence gathered from the crime scene itself, and any evidence related thereto. Tr. 2742-2762.
{¶ 54} McCrary listed the items he reviewed before reaching his conclusions about the fire. McCrary looked at virtually all the state's evidence including information relating to insurance claims made by Garcia in the past along with the policies she had purchased before the fire. Tr. 2715, 2766-2771. When asked to proffer his opinion about what type of arson had been committed in this case, McCrary offered the following testimony:
 {¶ 55} Q: What's the significance of looking at a defendant's actions and determining whether or not they meet up with her intent to commit the crime and whether or not the actions are more indicative of insurance claim or buying of the home?
{¶ 56} * * *
 {¶ 57} A: * * * when we look at all the totality of the circumstances, in my opinion it looks more like positioning one's self for potential insurance fraud —
{¶ 58} * * *
 {¶ 59} Q: Testified about the different categories of arson, is that correct?
{¶ 60} A: Yes, sir.
{¶ 61} * * *
 {¶ 62} Q: Based upon the information that you have reviewed and the hypothetical questions that I have given you here, which category of arson would this more than likely have been used in, sir?
{¶ 63} * * *
 {¶ 64} A: It is my opinion that this is more consistent with a for-profit arson, an arson for profit than it is any of the other categories.
{¶ 65} Tr. 2771-2772.
{¶ 66} Saunders testified that he is a forensic auditor and that in that capacity, he reviews information to determine whether there is a financial motive for the commission of a particular crime. Saunders told the jury that, based upon his review of Garcia's financial situation before the fire, he believed that she did have a financial motive to commit arson.
{¶ 67} According to Garcia, McCrary's and Saunder's testimony was highly improper because they should not have been qualified as experts nor allowed to invade the province of the jury by stating that it was arson for profit and that Garcia had a financial motive for setting the fire. These conclusions belong to the jury and only the jury. We agree such testimony improperly invaded the jury's province. Both McCrary's and Saunders' testimony, moreover, was merely cumulative of other evidence presented. We must conclude, therefore, that McCrary's and Saunders' testimony was improperly admitted.[6]
{¶ 68} Next is the issue of whether either man's testimony, though improper, amounted to prejudicial error. State v. Barton (1991),71 Ohio App.3d 455, 594 N.E.2d 702. As stated by the Ohio Supreme Court in State v. Webb (1994), 70 Ohio St.3d 325, 334, 638 N.E.2d 1023, 1032, [a] nonconstitutional error in a criminal case is prejudicial if there is not other substantial nondisputed evidence to support the guilty verdict.
{¶ 69} In the case at bar, the undisputed evidence showed that Garcia told inconsistent and contradictory accounts of what she did when she realized the house was on fire. Garcia never disputed the state's evidence that contradicted her claim that she had broken the second floor bedroom window and escaped out onto the roof and then jumped down to the ground. Firefighter Hlatky testified that he broke out that window to ventilate the room. There was also testimony that Garcia could not have gone out the window because it was too small. Uncontradicted evidence showed that her physical condition and appearance were wholly inconsistent with that of someone who had exited through the second floor window as an escape.
{¶ 70} Garcia never disputed, furthermore, the evidence proving that she had taken out insurance not only on the house just before the fire, but also on the lives of her two daughters. Garcia never disputed the evidence that Nyeemah was tightly bound with a cord the child could not have tied. Finally, evidence showed that Garcia knew she could not join the Navy if she had custody of Nyeemah and Nijah and that she had made inquiries about transferring custody to her sister.
{¶ 71} Nothing contradicted the evidence of Garcia's expertise as a contents specialist for Sabur Builders and that the property losses listed on her own claim forms could not be substantiated. Garcia did not dispute her neighbor's testimony that Sabur Builders moved pieces of furniture out of the house the day before the fire. There was no evidence to rebut Lanum's testimony that Garcia admitted to intentionally setting the fire for insurance money.
{¶ 72} Because of the foregoing evidence, which we determine to be substantial, undisputed, and persuasive, we find that McCrary's and Saunders' improper testimony did not alter the outcome of the trial. The first and second assignments of error are overruled.
{¶ 73} THIRD ASSIGNMENT OF ERROR
 {¶ 74} The trial court erroneously dismissed jurors for cause who unequivocally stated that they could be fair and impartial despite having knowledge of prior proceedings.
{¶ 75} Whether to disqualify a juror for cause is "a discretionary function of the trial court * * * [not reversible] on appeal absent an abuse of discretion." Berk v. Matthews (1990),53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus. It is the trial judge who sees and hears the prospective jurors and can evaluate their responses. State v. Allen (1995), 73 Ohio St.3d 626, 629, 653 N.E.2d 675. A court's determination in a voir dire proceeding of a prospective juror's fairness and impartiality constitutes reversible error only when it can be shown that the court, in conducting the examination, clearly abused its discretion. State v. Williams (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323.
{¶ 76} In the case at bar, prospective jurors Nos. 3 and 9 were dismissed for cause during voir dire. When asked what he knew about the case and whether he knew either counsel or the parties in this case, Juror No. 3 responded as follows:
 {¶ 77} A: No. I remember just the headlines on the paper. I believe there was two trials involved with Garcia that both ended in mistrial.
{¶ 78} * * *
 {¶ 79} Q: And you know the results of the other trial?
{¶ 80} A: Two mistrials, if I recall right.
{¶ 81} Tr. 131-132.
{¶ 82} Prospective Juror No. 9 was also asked what she knew about the case from media sources.
 {¶ 83} Q: * * * Tell us what it is you know with respect to this case.
{¶ 84} A: Well, just what I read in the paper.
{¶ 85} Q: What would that be?
 {¶ 86} A: I mean, that she was accused of burning her house with the children in it. And I think the last trial she had she was found I don't know. I guess found not guilty or whatever. And that was it.
 {¶ 87} Q: Do you remember when you read that in the paper?
{¶ 88} A: I read something in today's paper.
{¶ 89} Tr. 136.
{¶ 90} Contrary to Garcia's claim, both Jurors Nos. 3 and 9 acknowledged they knew not only about previous trials, but also the outcome in at least one of them. Juror No. 3 knew there were two previous mistrials. Juror no. 9 believed there was at least one prior trial that ended in a not guilty verdict. Because this information of the prior history of the case favored the defense, we cannot say the trial court abused its discretion in excusing both jurors for cause. The third assignment of error is without merit.
{¶ 91} FOURTH ASSIGNMENT OF ERROR
{¶ 92} The trial judge erred by failing to inquire into allegation of jury misconduct that occurred during the deliberation process and by failing to grant a mistrial based upon the misconduct.
{¶ 93} Garcia claims that one juror's concerns for his safety so tainted the jury's deliberation process that Garcia is entitled to a new trial. We disagree. The United States Constitution does not require a new trial "every time a juror has been placed in a potentially compromising situation * * * [because] it is virtually impossible to shield jurors from every conduct or influence that might theoretically affect their vote." State v. Johnson (Jan. 16, 1997), Cuyahoga App. No. 70234, citing State v. Phillips (1982),455 U.S. 209, 217, 71 L.Ed.2d 78, 102 S.Ct. 940.
{¶ 94} Garcia argues that the jury foreman was concerned for his safety because he worked in the area where the crime took place in and was afraid Garcia's family knew him. Garcia claims, but does not prove, that the foreman's concerns affected the rest of the jury members and thus tainted the whole deliberation process. A juror's concerns for safety, standing alone, are not sufficient to warrant a new trial. Johnson, supra. In State v. Phillips (1995), 74 Ohio St.3d 72, 88-89,656 N.E.2d 643, the Ohio Supreme Court held that the defense must prove that the juror was biased. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1. A mistrial should not be granted merely because some minor error or irregularity had arisen. State v. Blankenship (1995), 102 Ohio App.3d 534, 657 N.E.2d 559.
{¶ 95} The record shows the following sequence of events. During deliberations, the jury foreman informed the judge that he had concerns for his safety if he remained to deliberate and reach a verdict. He conveyed his concerns to the court by a letter which stated:
 {¶ 96} Your Honor, because I work in the immediate area of the burnt home, I feel grave concern for me and my family's personal safety. The family of the defendant owns property in the neighboring area and can easily identify me, especially since we are in the same business. The propensity for contact, (visual or physical) is highly likely. It is my feeling as well as those of my fellow jurors, that I be removed from the jury.
{¶ 97} The record indicates that the letter was signed by three different jurors, who, according to Garcia's counsel, tainted the deliberation process because, apparently, all three people had been improperly discussing matters amongst themselves. A second note was also delivered to the court in which the jury requested a change in their foreman.
{¶ 98} In response to the concerns raised by the letter and the note requesting a change in foreman, the defense made motions for a mistrial and for voir dire[7] of the three jurors who signed the letter. In response to the letter expressing a concern for the safety of one juror, the court, in a note, told the jury to continue in their deliberations. Tr. 3845.
{¶ 99} In response to the request to change the foreman, the court, again by written response, told them [t]he Court will not interfere with the decisions you make during your deliberations. Tr. 3854. The court also denied the motion for a post-verdict voir dire because there was no evidence of any taint by an independent source * * * other than a juror. Tr. 3867.
{¶ 100} The record reflects that the jury reached a verdict before the foreman was changed. After the court determined this sequence of events, the jury was then instructed to return to the jury room to fill out the verdict forms so that all of the forms reflected the new jury foreman. After the jury rendered its verdicts on all counts in open court, they were polled individually. Each juror verbally indicated individual agreement to each verdict. Tr. 3902-3903.
{¶ 101} On the record before us, there is nothing to indicate that the foreman's or other jurors' concerns about safety tainted their verdict. To the contrary, the verdict forms show that a verdict had already been reached before the jury replaced the foreman. Indeed, if the foreman's vote was based on his personal concern for safety, then a vote of not guilty would be expected. That was not his vote, however. Absent evidence of an improper outside influence and resulting bias, we do not find that Garcia was denied a fair trial. Garcia's fourth assignment of error is overruled.
{¶ 102} FIFTH ASSIGNMENT OF ERROR
 {¶ 103} The trial court erred by unduly restricting the defense cross-examination of Detective Matuszny and Tonya Lanum.
{¶ 104} In this assignment of error, Garcia argues that she should have been able to cross-examine two of the state's witnesses, Detective Matuszny and Tonya Lanum, about the fact that they knew Garcia had passed two polygraph tests. Garcia claims that she was denied her constitutional right to confront these witnesses because the court prohibited any examination about polygraph tests or results.
{¶ 105} A criminal defendant has a constitutional right to confront and cross-examine his accusers. Pointer v. Texas (1965),380 U.S. 400. During trial, however, the court retains the authority to reasonably define the limits of cross-examination by a defendant.
{¶ 106} Controlling the scope of cross-examination, therefore, is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Slagle (1992), 65 Ohio St.3d 597,605, 605 N.E.2d 916.
{¶ 107} In the case at bar, Garcia was prohibited from cross-examining either Matuszny or Lanum about Garcia's statement in jail to Lanum that she had passed two polygraph tests. The Ohio Supreme Court has consistently held that, absent stipulation by the parties, polygraph evidence, favorable or unfavorable, is not admissible. State v. Spirko, (1991), 59 Ohio St.3d 1, 570 N.E.2d 229; State v. Levert (1979),58 Ohio St.2d 213; 389 N.E.2d 848; State v. Souel (1978),53 Ohio St.2d 123, 372 N.E.2d 1318.
{¶ 108} In the case at bar, Garcia's purported comments about the results of her polygraph tests to Lanum are inadmissible. The fifth assignment of error is overruled.
{¶ 109} SIXTH ASSIGNMENT OF ERROR
 {¶ 110} Prosecutorial misconduct throughout trial deprived the appellant of her right to a fair and impartial jury.
{¶ 111} In her sixth proposition of law[8], Garcia claims that the prosecutor committed misconduct throughout her trial. In order to decide the merits of this claim, we must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected substantial rights. State v. LaMar (2001), 95 Ohio St.3d 181,767 N.E.2d 166 citing State v. Smith (1984), 14 Ohio St.3d 13,470 N.E.2d 883. Upon appellate review, the focus of the analysis "is the fairness of the trial, not the culpability of the prosecutor." LaMar, supra citing Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,71 L.Ed.2d 78. If it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments, we will not conclude that a trial was unfair. LaMar, supra; State v. Treesh (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749.
{¶ 112} In the case at bar, Garcia argues that the prosecution's failure to provide appropriate discovery until the trial began prejudiced her right to a fair trial. Discovery violations pursuant to Crim.R. 16 may result in reversible error only upon a showing that (1) the prosecution's failure to disclose was a willful violation of the rule; (2) foreknowledge of the information would have benefitted the accused in preparing a defense; and (3) the accused has suffered prejudice. LaMar, supra.
{¶ 113} Garcia maintains that, just as trial began, the state presented a list of witnesses not disclosed to her beforehand. The first witness Garcia takes issue with is firefighter Frank Atkins, who testified about finding a Bic lighter at the scene of the fire. Garcia believes that Atkins' testimony was prejudicial because it provided the jury with a source of the fire other than the candles. Appellant's brief at p. 38. Garcia's claim is persuasive only if the jury found Atkins to be credible and gave his testimony undue weight and consideration.
{¶ 114} In light of all the evidence presented by the state and Garcia, however, we do not conclude that Atkins' testimony was so prejudicial it altered the outcome, or denied Garcia a fair trial.
{¶ 115} The record before us reveals that the jury also heard evidence about the use of accelerants from several experts along with testimony from Garcia's own experts who testified that the fire was either accidental as a result of the candles tipping over or indeterminate in nature. None of the experts said anything about a lighter being part of their investigation into the cause of this fire, nor did any of them rely upon Atkins' testimony in forming their opinions about the cause and origin of the fire.
{¶ 116} Atkins' testimony about finding the lighter at the scene, moreover, was not without problems: the lighter did not seem affected by the intense heat of the fire, he did not preserve the lighter as evidence, and, even though he knew the fire was being investigated as a possible arson, he never came forward with the information until the trial. These problems would have affected whether the jury believed or trusted him. In light of all the other expert testimony relating to the cause and origin of the fire, we do not find that Garcia was materially prejudiced by Atkins' testimony or denied a fair trial.
{¶ 117} Garcia also argues that witness Sakina Fails' testimony about a document which identified Garcia as a contents specialist with Sabur Builders was a discovery violation. The trial court allowed Garcia to view the document in advance of Fails' testimony and determined that it was not willfully withheld by the prosecution. Garcia claims that the prosecution had the document for months before trial but that she was not given an opportunity to view it until just before trial.
{¶ 118} As with Atkins' testimony, we find no material prejudice suffered by Garcia because Fails referred to a document that listed her as a contents specialist with Sabur Builders. Garcia fails to show how she suffered prejudice. The record shows that other witnesses, namely, Dan Curtin of Erie Insurance Co. and Mary Tabakow of the Cuyahoga County Department of Human Services, testified about Garcia's employment with Sabur Builders and what she did there. For example, Curtin told the jury that Garcia refused to accept his loss of claim forms to do her inventory because she already had her own claim forms at home. Tr. 1642. Garcia also fails to provide any proof that the document was willfully withheld by the prosecution. Accordingly, we find no merit in Garcia's claim that the she was denied a fair trial because of Fails' testimony from the document.
{¶ 119} Next, Garcia argues that the prosecution had a duty to disclose evidence she could have used to impeach McCrary. McCrary told the jury he had testified in other trials as an expert on crime scene analysis. McCrary failed to disclose the fact, however, that in some of those cases, he was precluded from testifying about profiling and was limited to the area of crime scene analysis only. Garcia states the state's crime scene investigator either perjured himself or a number of appellate decision's [sic] upholding profiling were decided in the short time between his testimony in Tennessee v. Stevens, supra and his testimony in this case. Appellant's brief at p. 38. Garcia did not object to this part of McCrary's testimony and she has, therefore, absent plain error, waived this argument here on appeal. State v. Smith (2000),87 Ohio St.3d 424; State v. Williams (1977), 51 Ohio St.2d 112,364 N.E.2d 1364.
{¶ 120} We find no plain error because Garcia has failed to provide this court with any evidence to support her claim that the prosecution withheld the information or to explain how she was prejudiced by not having it during her lengthy cross-examination of this witness. We highlight the fact that before McCrary was cross-examined, Garcia had a copy of McCrary's curriculum vitae which listed all of the cases in which he served as an expert.
{¶ 121} Garcia also maintains that the prosecution withheld impeachment evidence about Mr. Roby, who, on direct examination said he had worked for the Ithaca Fire Department and had volunteered for the Belleville, Michigan Fire Department. According to Garcia, the state should have informed her that it was going to bring in two men from each department during Roby's cross-examination in order to impeach his claims to have worked for each department in the past. The record reveals that both men stood in the courtroom and Roby was asked whether he recognized either of them. The record shows that Garcia did not timely object to the presence of either man and that her counsel conducted a thorough redirect examination in order to rehabilitate Roby. Moreover, the unchallenged evidence was so overwhelming that this error would not alone have altered the outcome.
{¶ 122} The last two acts of misconduct alleged by Garcia involve two statements made by the prosecution during closing argument. During closing, the prosecution referred to Garcia as a predator and stated in his opinion that Angela Garcia is guilty of these charges.
{¶ 123} The prosecution is entitled to some latitude and freedom of expression in closing argument. LaMar, supra. However, it is improper for an attorney to express a personal belief or opinion about the guilt of an accused. State v. Smith (1984), 14 Ohio St.3d 13, 470 N.E.2d 883; State v. Williams (1997), 79 Ohio St.3d 1, 679 N.E.2d 646.
{¶ 124} The prosecutor's comment about Garcia's guilt clearly exceeded the scope of proper argument. On the other hand, the reference to Garcia as a predator is not error. State v. Abi-Adballah (Oct. 22, 1998), Cuyahoga App. No. 73007. It is merely a rhetorical technique of persuasion. Neither this comment nor the predator reference warrants reversal, moreover, unless the remarks prejudicially affected substantial rights of the accused. State v. Hessler (2000), 90 Ohio St.3d 108, 125,734 N.E.2d 1237.
{¶ 125} In making this determination, we must consider the effect of any misconduct in the context of the entire trial. We must also view the prosecutor's closing argument in its entirety when determining prejudice. State v. Hill (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068; See State v. Keenan (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. Using these standards, we see no basis for reversing Garcia's conviction, because the comments clearly did not pervade the entire trial, let alone the closing argument. We are unpersuaded that the result of Garcia's trial would have been different absent the improper comments by the prosecution.
{¶ 126} Garcia's sixth assignment of error is overruled.
{¶ 127} SEVENTH PROPOSITION OF LAW9
 {¶ 128} The trial court erred by allowing prejudicial other acts evidence to be introduced to the jury.
{¶ 129} EIGHTH PROPOSITION OF LAW
 {¶ 130} The trial court erred by allowing the jury to consider unfairly prejudicial evidence that was not relevant to the offenses charged.
{¶ 131} Garcia's seventh and eighth assignments of error relate to the trial court's admission of certain evidence at trial. Because these assignments are interrelated, they will be treated together. As the Ohio Supreme Court stated in State v. Hymore (1967),[9] Ohio St.2d 122, 128, 302, 224 N.E.2d 126, 130, "[t]he trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere."
{¶ 132} Garcia argues that various witnesses for the state should not have been allowed to testify about her other acts or provide testimony that was not relevant in violation of Evid.R. 402, 403, and 404.
{¶ 133} As noted earlier, the admission or exclusion of evidence rests within the discretion of the court. Hymore, supra. The Supreme Court of Ohio has explained other acts:
 {¶ 134} Under longstanding principles of Anglo-American jurisprudence, an accused can not be convicted of one crime by proving he committed other crimes or is a bad person. As Evid.R. 404(B) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Nonetheless, evidence of other acts, though they be crimes, may be admissible for other purposes. Evid. R. 404(B) specifies admissibility to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." R.C. 2945.59, predating Evid. R. 404(B), mandates admissibility for specific purposes such as defendant's scheme, plan or system. Nonetheless, the standard for determining admissibility of such evidence is strict.
{¶ 135} State v. Jamison (1990), 49 Ohio St.3d 182, 185,522 N.E.2d 180.
{¶ 136} Here, Garcia asserts it was error to admit the following testimony:
 {¶ 137} 1. Sakina Fails testified that after her own fire, Garcia came to her house to prepare a contents inventory. Garcia asked her if she wanted to list any contents upstairs. (T. 951) The damage was in the kitchen on the first floor. Sakina testified that she told another prosecutor that Garcia wanted Sakina to claim items she did not have (T. 1044).
 {¶ 138} 2. Detective Hugh Mills testified that he investigated a fight at a night club on 10/31/99. Garcia was one of the victims. He typed up Garcia's statement. Garcia gave him an address in Twinsburg (T. 1856-1869). State wanted to show that she lied about her address to a police officer for an official report. Therefore, it was easy for her to lie to the police. Also, it seems they wanted to infer that she wasn't planning to live on Harvard for long.
 {¶ 139} 3. Jan Waterman testified that Garcia worked for Marriott until she resigned for no reason (T. 1874-1877).
 {¶ 140} 4. Eric Pfeil was a claims manager for Progressive (T. 1896). He testified that five claims were made against Garcia's car insurance policy in one year (T. 1898). He testified that the policy originally carried a Twinsburg address. The rates for car insurance in Twinsburg were cheaper than those for Cleveland. Garcia complained of the change to Pfeil's supervisor and the information was changed back to Twinsburg (T. 1903).
 {¶ 141} 5. Barbara Orefice testified that Garcia worked for American Building Maintenance until she resigned for no reason (T. 2123-2124).
 {¶ 142} 6. Mary Tabakow was with the County Department of Human Services (T. 2128). She was Garcia's case worker in 1999. Garcia had to reapply for assistance every three months (T. 2143). Tabakow had to review Garcia's case to determine eligibility for assistance (T. 2139). Garcia told Tabakow that Marriott had fired her (T. 2136). Garcia gained new employment with Sabur Builders (T. 2140). Although Tabakow prefers pay stubs, she accepted a letter from Judy Nichols to verify Garcia's employment (T. 2146).
{¶ 143} Appellant's brief at p. 43-44.
{¶ 144} Garcia also claims that testimony by ATF special agent, Lance Kimmell, an arson expert, was improper because he was permitted to testify about Garcia's motive. Contrary to Garcia's claim, we find no indication that Kimmell testified about her motive. Kimmell stated that Garcia's injuries did not match her account of how she escaped the house, and her explanation of the events the night of the fire did not coincide with the evidence at the scene. Garcia argues that all the above testimony was irrelevant, disparaged her character, or let the jury believe that her past conduct was consistent with her conduct regarding the fire. Nowhere does Garcia explain how she was prejudiced by the testimony or which testimony supposedly had what effect. More importantly, Garcia makes no attempt to show how the outcome of the trial would have been different had any of the testimony been excluded.
{¶ 145} Assignments of error seven and eight are without merit.
{¶ 146} NINTH PROPOSITION OF LAW
 {¶ 147} The trial court erred by failing to merge the three counts of Aggravating Arson.
{¶ 148} Garcia argues that the trial court should have merged the three separate counts of aggravated arson. We disagree. Multiple offenses can be merged only if they constitute allied offenses of similar import. State v. Rance (1999), 85 Ohio St.3d 632, 710 N.E.2d 699.
{¶ 149} R.C. 2941.25 provides:
 {¶ 150} (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 151} (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
{¶ 152} The crime of aggravated arson is defined in R.C. 2909.02, which, in part, provides:
 {¶ 153} (A) no person, by means of fire or explosion, shall knowingly:
 {¶ 154} (1) create a substantial risk of serious physical harm to any person other than the offender;
 {¶ 155} (2) cause physical harm to any occupied structure * * *.
{¶ 156} As noted in Rance, supra, at 638-639,
 {¶ 157} Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other. And if the elements do so correspond, the defendants may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. (Citations omitted)
{¶ 158} As we recently stated in State v. Poelking, (Apr. 11, 2002), Cuyahoga App. No. 78697, when an offense is defined in terms of conduct towards another, then there is a dissimilar import for each person affected by the conduct. Poelking at 10.
{¶ 159} Because the indictment against Garcia, just as in Poelking, alleged conduct against two different victims and an occupied structure and she tied up one child, the charged offenses did not meet the requirements of being allied offenses under R.C. 2941.25(A). That being the case, the court did not err by failing to merge the offenses. Assignment of error nine is without merit and overruled.
{¶ 160} TENTH ASSIGNMENT OF ERROR
 {¶ 161} The appellant was deprived [sic] the effective assistance of counsel at trial.
{¶ 162} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. State v. Hartman (2001), 93 Ohio St.3d 274, 754 N.E.2d 1150; Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In the case at bar, Garcia claims that her counsel was ineffective because he failed to object to the prosecution's reference to her as a predator and because he failed to object to the court's failure to merge the three counts of aggravated arson.
{¶ 163} Because we have already determined that the prosecution's use of the word predator to describe Garcia during closing argument was not error and that she was not entitled to a merger of the three aggravated arson counts, we do not conclude that her counsel's performance was deficient. The tenth assignment of error is overruled.
{¶ 164} ELEVENTH ASSIGNMENT OF ERROR
 {¶ 165} Cumulative error deprived the appellant [sic] her right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
{¶ 166} A conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial. State v. Jackson (2001), 92 Ohio St.3d 436, 751 N.E.2d 946 citing State v. De Marco (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus. However, in this case, we find that appellant received a fair trial.
{¶ 167} In the case at bar, we have determined that though individual errors occurred, Garcia suffered no prejudice from any of them. Without a finding of prejudice on at least two errors, there can be no cumulative prejudicial effect. Moreover, the trial lasted more than two weeks with each side given every opportunity to present its case. As a result of our review of the record before us, which is comprised of hundreds of exhibits and thirteen volumes of testimony, we conclude that Garcia's eleventh assignment of error is without any merit.
The judgment of the trial court is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., P.J. AND COLLEEN CONWAY COONEY, J., CONCUR.
[1] Initially, Garcia had been indicted and convicted on four counts of aggravated murder. The indictment included two theories of aggravated murder of a person under thirteen years of age in violation of R.C.2903.01. For each victim, the indictment included one count of aggravated murder with a mass murder specification and a second count of aggravated murder with a felony-murder specification. The jury convicted Garcia on all four counts. Prior to sentencing, however, the trial court merged the four counts of aggravated murder into two counts; one for each victim.
[2] In the first of two previous jury trials, Garcia was convicted of one count of insurance fraud; the trial court declared a mistrial on the remaining eleven counts because the jury could not reach a unanimous verdict. Garcia's conviction for insurance fraud is not part of this appeal.
We further note that in her first trial, Garcia was charged with capital murder. That charge, however, was not part of the trial which is the subject of this appeal.
[3] At least two of these witnesses, Robert Gartner and Richard Patton, had not testified in either of Garcia's first two trials. Both men were qualified by the court as experts and both opined that the fire had two different points of origin and that at both points some sort of accelerant had been used.
[4] In lay terms, the presence of an accelerant at a fire scene strongly suggests that the fire was intentionally set with some type of flammable liquid. Evidence of the use of an accelerant at a fire scene is typically proven by the presence of pour patterns indicative of the fire's point of origin.
[5] Albert Lugo, Robert Gartner, Richard Patton, Mark McCrary, Ralph Peachman, and Lance Kimmel.
[6] We need not decide the issue of whether McCrary or Saunders meet the rest of the requirements under Evid.R. 702.
[7] Garcia's counsel made two different motions for voir dire; one motion requested a voir dire before deliberations resumed and the other was for voir dire to be done immediately after a verdict was rendered.
[8] Appellant erroneously refers to the sixth assignment of error as the sixth proposition of law.
[9] Appellant erroneously lists assignments of error nos. 7, 8 and 9 as propositions of law.